v. Sean James Hager. Mr. Hunter. Thank you, Judge Dennis, and may it please the Court, irrespective of whether this Court finds that McNally and its reinterpretation in Skilling have completely obliterated the intangible rights doctrine in the fraud prosecution, it is important that we keep in mind the underlying rationale for why the court in McNally held the way it did. Intangible rights, by their nature, being ethereal and difficult to quantify, are inherently dangerous. We recognize this because in each given case, the rubric and the standard for determining whether or not a property interest sounds and exists is impossible to quantify. The government suggests that if it's subjectively believed by the employer, by the business, that they have a secret, that they have a confidence, that they have some reason for keeping this information outside of public knowledge, that that alone is sufficient. But by that rubric, we are all at jeopardy at any given moment of being taken to jail by our employer. Something more concrete has to be in place if we're going to allow this kind of a prosecution to go forward. Well, didn't Velocity take explicit, extensive measures to protect this information? It wasn't public. Well, Your Honor, I think that, again, it's difficult to quantify what specifically we mean when we're talking about what measures were taken. Yes, Velocity had a noncompetition clause. That noncompetition clause included an expectation that certain aspects of the business were to be kept private. However, by the same token, the government also had multiple confidentiality agreements that they had the employees sign. Is that right? Yes, Your Honor. Multiple. And then they had a manual where they expressly designated that the information contained in the VIS was confidential. Well, yes. Also true. But I think it's critical we note for a moment, Your Honor, that this business, Velocity, ran essentially two different kinds of broad sweeping sales. One was very small parts, microchips, that sort of a thing. The other was this PCP component to the business, which included big items, monitors, hard drives, that sort of a thing. In the PCP side of the business, we're talking about prices that are not static. These are prices that fluctuate within minutes, within hours, within days. The VIS system from Velocity, its primary function, as far as I can deduce from the record, was to assist in the board component side of the business. The PCP side of the business was such that the historic pricing doesn't really give the salesman any added knowledge for consummating this particular deal because it's a very subjective question. On this day, at this hour, how many of these products are available and from whom? But that's how he knows to price. That's how he knows to be competitive. Well, I think for the purposes here, what the VIS system really tells us is where is Velocity's bottom line? What does Velocity need in order to make a profit from this transaction based upon the purchase order they're receiving from Dell? And I say Dell, obviously it could be others, but Mr. Hager's account was principally with Dell. What about that is specifically confidential? Yes, there's a confidentiality agreement, but the price that Dell is wanting to pay for the good isn't Velocity's secret to keep. Dell could send that invoice out to a number of different potential sellers of the good. The historical pricing of what Velocity paid for that good in the past is of no particular help because we're only concerned with what this good costs right now. So I think it's more helpful to look at the VIS system as— You're suggesting that the history of the price of a product is not helpful when you're looking at what the present value of it is? Well— That offers no help at all. Is that what you're suggesting? I think it does offer some help, but the question is, is it truly unique? Velocity's very proud of its VIS system. There was testimony about the fact that it, to them, assisted their salesmen greatly. But at the same time, there's no reason, there's no evidence in the record to suggest that that was the exclusive source of that information. These are goods that are being traded in a digital age. The price of a hard drive or a monitor is ascertainable from thousands of different sources. And historical data can be compiled by just simply consulting the Internet, looking at what it's going for on websites like eBay, looking for— I mean, even just calling up other salesmen, seeing what they're getting from Dell for those parts. What I'm suggesting is not that there wasn't— there weren't a series of protections that Velocity put in place for these things. There were. We readily concede Velocity did attempt to treat this information differently. However, it's unrealistic for us to say that Velocity had exclusive possession of that interest because this information is readily available. The nature of the price system necessitates communication. In order for us to be able to agree to a price, the price communicates information to us. And I think that in this case, because we're talking about non-static goods, there is really no way to say that Velocity had a secret sauce, that it had exclusive right, or that it had a monopoly on this information. This information was publicly available. And so I think more important than that, and getting to the heart of Your Honor's question, simply because an employer designates an item as being subject to a confidentiality and non-competition clause, is that going to be our test for when this becomes a wire fraud and mail fraud prosecution? I certainly agree that the conduct of Mr. Hager justified a lawsuit, justified civil action. That's why we have contracts. In order to let business move forward, we have to be able to also contemplate that businesses and individuals will intentionally breach contracts because that may be in their best financial interest. That's, in my way of thinking, the way that the court system facilitates the free market, is by allowing a civilized way for individuals to elect to opt out of an agreement, to breach that agreement, and for the court to decide the damages or potentially liquidate the damages. That should not be our test for whether or not we have misappropriated confidential information for fraud, for criminal prosecution, which is the question we're called here today. So how is this different from Carpenter and what happened at Carpenter? Well, Your Honor, I think that it's different in a number of respects. In Carpenter, we're talking about the actual finished good being misappropriated. When the author of the Heard on the Street column took that information, leaked it to the individuals making the trades, and then profited himself from those trades, he was actually diminishing the value of the finished product of the good. He was affecting the market price and using that information before it was supposed to be released to the general public and sold to the customers of the Wall Street Journal. In this situation, we're not talking about a finished good or a finished product. We're talking about loosely held information, information that could have been acquired from the VIS system, as the Court suggests, but also could have been acquired from a number of other sources. We're talking about something that there's no evidence in the record to suggest actually affected the finishing price of the good. Velocity made a profit at the margin that it wanted to make a profit. But isn't the essence of the holding in Carpenter that the intangible property was covered by the mail-and-wire fraud statute, not what it affected? Well, Your Honor, I think that is the question. We see Carpenter come out right after McNally, within the same year, within months of each other. It appears that it is in direct response to McNally when that opinion is written. But what I think we have to grasp here is also, if Carpenter is intended to be taken as an exception to McNally, yes, intangible rights is too broad, but we're going to allow this subset to still survive. The question still remains, what did Skilling do to that? Because this isn't a pure common law interpretation question. The common law would suggest that Carpenter survives. But that would be to ignore Congress's intent. Skilling didn't even mention Carpenter. I'm sorry, Your Honor. Skilling's opinion doesn't even mention Carpenter. No, it does not. But it does discuss in great detail intangible rights. And in particular, it's discussing the statute Congress enacted to respond to McNally. And McNally explicitly obviated a number of intangible rights theories of fraud prosecution. And as Justice Stevens suggested in his dissent, that included the abuse and misuse of confidential information. Now, I think that we can infer that at the time that Carpenter and McNally were penned, there was a decision to try and creep back what McNally had done in Carpenter. But whether or not that has continued in light of Skilling, in light of the enactment of the Honest Services Broad provision, is an unanswered question. I could not identify a case that has addressed this question since Skilling, nor could the government. The government refers to several cases, many of which are pre-Skilling, but it also lists Shaw, Ali, and Mahaffey, which also fail to consider the relationship between Carpenter and Skilling. There is no guidance here. This is a new question, a question of first impression since Skilling came down. And the question we then have to ask is, was Carpenter a reactionary opinion? Was it designed to respond to McNally, or was Carpenter meant to stand the test of time in light of the fact that Congress reacted directly to McNally on its own front? I would submit that the Court must yield to the statutory language that Congress has spoken and that their silence as to intangible rights questions answers the question. There is no such claim. But again, Your Honors, I don't believe we have to go that far to make this finding, because, again, in this case, the evidence is not sufficient to conclude that he appropriated that confidential information, to conclude that he took a thing of value or a property. In the opinion United States v. Loney, this Court equated directly property to a thing of value. We can talk about the fact that there was a confidentiality agreement. We can talk about the fact that this was a listed item, that some of these things were considered to be confidential. But what is the value of those things? When we really stop and unpackage it, we talk about historical pricing, even in a non-static situation. What value would we ascribe to the price of a widget six months ago, the fact that this company knows what that widget costs six months ago? Your clients seem to find value in it. Well, the fact that something could be converted to a valuable use, I think, is a distinction. There's a difference. There's a difference between that and value intrinsic to itself. This desk, the bench, these are items of value. We could buy them. Are you arguing that this was not property? Correct, Your Honor. Did the — this case was tried, right? This case was tried. Did the judge instruct the jury on what it must find with respect to whether or not the property was used in connection with the wiring? The trial court was presented with this question, Judge Dennis, and the court struggled with it. The issue for the court turned on the interpretation of Carpenter. And the judge in the case reasoned that, as was discussed a moment ago, if Carpenter recognized that this kind of an intangible right could sound in fraud, then this case could also sound in fraud for the same reasons, that this kind of an intangible right is recognizable under property. That was the trial court's conclusion based upon really only Carpenter. The whole conversation from the motion to dismiss all to the charge conference was about whether or not Carpenter is still good law, whether Carpenter applies. And I would submit that Carpenter is not good law, that if it is good law, it does not apply because it talks about finished good, the final marketable product. Well, you know, the Supreme Court has told us many times not to try to overrule his decisions or to limit them when they haven't limited. I certainly agree, and I think that that kind of judicial conservation is important. But I think that the court is potentially in a catch-22 here because we have to harmonize Skilling, Carpenter, and the honest services fraud provision. Well, the Supreme Court wrote Skilling and didn't mention Carpenter. Why do we have to harmonize? Well, the issue was slightly different. But the holding of Skilling is a broad one. The holding of Skilling is an attempt to pare this question back down to what are the essential claims where we don't have tangible rights or tangible property interests where we can bring this kind of a case. And Skilling is taking us back home to what Congress enacted and saying this is it. McNally was broad sweeping. It cut like a machete. And Congress came back and only gave us these two options. I think that the failure to discuss Carpenter could easily be construed as simply an oversight or not necessary because the opinion is very broad. I want to — I hate to move off of this subject. I do want to again emphasize that I think the sufficiency question cures your concerns, Judge Dennis, about overruling the Supreme Court. You can find that this is not property without having to make the ultimate conclusion that Carpenter has been invalidated by Skilling because we have no test to go off of other than the subjective opinion of the employer. That's the government's proposed solution is that courts decide what was the subjective opinion of the employer, irrespective of whether that's reasonable, unreasonable. They decide. When employers are making the law, employers are deciding how the government might prosecute someone. I think that creates a problem. We need some test. I've submitted the Monsanto test, the Boeing airplanes test under Texas law as possible considerations. I think that those fit. I'm not suggesting the court adopt those, but I do think the government's solution is not appropriate. And then I'll reserve my three minutes of rebuttal to discuss the severance issue briefly with the court, if there are no additional questions. Well, rebuttal is for rebuttal. So you have to rebut what the government says. You don't get to bring up a whole new issue. On the question of severance, I would strongly encourage the court to also look deeply into this question. Mr. Hager had a clear, unequivocal defense to the tax counts. That was denied an opportunity to be heard because he could not risk being placed up on the stand to encounter all of the issues about dishonesty that relate to the wire fraud and mail fraud prosecutions. Severances are rare, and I acknowledge this. But so seldom do you have a record where such clear, concrete reasons for why severance is necessary are proffered, both before trial and during. I appreciate it, Your Honor. Thank you. Ms. Berringer. Good morning, Your Honor. May it please the Court, Elizabeth Berringer from the Western District of Texas on behalf of the United States. I just want to start out by pointing out that confidential business information for many, many decades has been held to be a protectable property interest under not only Carpenter but a long line of cases that go back to the 1800s in this country. And that confidential business information is not an unbounded definition that is subject to an employer's whim. According to Carpenter, confidential business information is information acquired or compiled by a business in the course and conduct of its business in which it has an exclusive right. And that definition has been further bounded by Supreme Court precedent. We have McNally, which says that it must be a thing of value. We have Pasquantino in Cleveland, which sort of dovetail into this concept that it must be property in the hands of the victim. So this is not just something that an employer can arbitrarily decide. It must be like some sort of value to the company. And in this case, taking the evidence in the light most favorable to the government, this was very valuable information to Velocity. It was not just price information as the defendant proposed to the jury and which the jury rejected. This is the defendant knew what parts Dell needed. This is 37,000 parts on that list. And he knew the specific parts that they needed and how much they would pay for it. But in addition to that information, which is given to Velocity subject to a nondisclosure agreement, which they agreed to give to Velocity under the terms of their contract, under the terms expecting that Velocity would keep it private, but they also, he had information about those VIS fail points, which is the maximum amount that Velocity was willing to pay. And this was overwhelming testimony of a lot of stored data that was in this computer program that set forth and even had a function to determine the price, that Velocity wouldn't pay more to the supplier for this amount of money. So the defendant, through ECT, used this confidential business information to sell parts to Velocity at prices that earned considerable profits for ECT without triggering those fail points. How long did he get away with the scheme? Four years. 2008 to 2012. Went undetected in the system because he was able to keep that price right below the fail point. As the testimony, as the court's aware, any time it went over that 20 percent margin, it required managerial override. And there was testimony from the defendant's supervisor that especially with Dell, they would have really been tracking that 20 percent and what they were doing in the margin because it was their most important customer. So he was able to stay right below the 20 and went undetected. And the reason that we know that this information is so valuable, right, is because the defendant profited so greatly from it. Hearing $1.1 million from this scheme to go right under that fail point and keep processing that, that was $1.1 million that was intended for the exclusive use of his employer. It was not intended to be enrich himself. You know, this scheme to deprive includes the concept of embezzlement and an employee using the resources of the company to enrich himself. Of course, Velassi had an interest in maintaining the confidentiality. Dell provided testimony that it would certainly make them not want to use a company that had misplaced their information and gave information about what type of prices they would pay for those parts because it would probably cause them to have to pay more in the market once their people learned that. And that's very similar to the Seventh Circuit's decision in Sharif, that when you, you know, part of its benefit is that it's providing the service to its customers of keeping that information private. So that's another aspect of the confidential business information. And I, one of the most important pieces of the information in knowing that this was confidential information is that the defendant admitted that it was. In his deposition testimony in that, when he was sued by Velassi, he admitted that he was using confidential business information that belonged to Velassi and sending it to his home email and ECT was using that to benefit. So his own testimony admitted that it was confidential business information. I'd just like to reiterate that no court has held that Carpenter has been overruled or that skilling extends to intangible property rights. Carpenter has continued to be applied uniformly by the Courts of Appeal and the Supreme Court. Even after skilling, we have several Court of Appeals decisions that have not even made it an issue and applied Carpenter and construed Carpenter in the case decided in the government's brief. In addition, last term, the Supreme Court reaffirmed its holding in Carpenter, using it to cite for the proposition about confidential business information being a property interest. And that's in the Supreme Court's decision in Shaw. Well, it certainly isn't a case of first impression. There's no evidence that skilling, which was interpreting intangible rights that are non-property interests, should be extended to the property realm. I think Carpenter makes that clear, that there's a distinction between intangible property interests and intangible rights, one being within the scope of the wire and mail fraud statute and one falling outside and having to fall under 1346. In addressing briefly the severance issue, I would just urge the Court, this is an exceedingly deferential standard in evaluating a court's decision under Rule 14a. This is not a question where this was a misjoinder of issues. This was clearly under Rule 8. The issues were properly joined, the fraud and then failing to report that same fraudulent income on the tax return or filing a false tax return. The defendant below failed to articulate sufficient reasons why. He said he wanted to testify in his tax case and gave a good reason for that, but he never articulated good reasons about why he couldn't also testify in his fraud case other than he didn't want to look bad. And that's not enough to show manifest prejudice. The government has done an exhaustive search of the case law. They've never found a case in any of the circuits where a district court has been overruled on similar charges. This is where it's actually the intertwined fraud and the failure to report the income absent some sort of compelling circumstances that have not been shown here. So if the Court doesn't have any further questions, I would cede the rest of my time. Thank you, Mr. Hunter. You have three minutes, Your Honor. Thank you, Your Honor. The government points out that it has been a longstanding tradition in the United States to prosecute cases where we're dealing with intangible rights. That is very true, but it's important to remember that many of those cases deeply consider questions like honest services in their decision. Procter & Gamble, for example, a case from the 40s, discusses many of the same questions we're talking about here, whether or not it's property, the nature of it being an intangible right, the employer's exclusivity to it, but also explicitly stated this is a crime because it deprived the employer of his right to honest services. The reason that this case is being brought against Mr. Hager is because of the dishonesty, the dishonesty in deceiving his employer, the general notion that we shouldn't insert ourselves into the middle in order to make a profit. And those things are unethical. There's no question. But they're not criminal. That component of it, that notion throughout the history of the United States that the honesty, the honest day's wage, was a piece of this intangible rights puzzle, is gone. That point can't be debated. The question then becomes, are we just trying to call these prosecutions by another name because we feel that there's some social need for it? I don't believe that that's a valid premise. The case is, in fact, a question of first impression because none of the cases the government can cite directly address this issue, which has been raised, I believe, for the first time. Shaw, for example, was a bank fraud prosecution. The question about the mail and wire fraud statutes, honest services fraud, not at issue. Ali, cited by the government, completely fails to consider Skilling, was written before Skilling came out. I believe they came out within months of each other. Mahaffey, another case the government relies on heavily, is a progeny of Brady v. Maryland. It's deciding materiality for discovery purposes. This issue is not being addressed, and it shouldn't be characterized as something where it's routinely done, this is commonplace, Carpenter has been well-established. And I think to look for guidance there, one need only look to the struggle that the court had at the trial level with this issue. The judge had to rely on Carpenter because there was nothing else. When asked for more authority, the government at trial could produce only three district court cases. This is something that hasn't been discussed in great detail, and it needs to be. But again, to finally emphasize, the court does not need to make a broad-sweeping action. As Judge Dennis pointed out, we do not need to be overruling the Supreme Court. The evidence is legally insufficient. And I appreciate the court's time. Thank you. That case will be submitted and taken under review.